Case number 07-3766 and 15-4308. Odraye Jones versus Margaret Bradshaw. Oral argument is not to exceed 30 minutes per side. Ms. Bailey for the appellant. Good afternoon, Ms. Bailey. You may enter your appearance. I understand you're reserving five minutes for rebuttal. You may proceed. Thank you, your honor. Good afternoon. May it please the court. My name is Catherine Bailey. I represent Petitioner Malik Alaa-U-Akbar, formerly known as Odraye Jones. I'd like to reserve five minutes for rebuttal, please. You may proceed. Given the time constraint, I plan to argue the racist evidence claim as presented in the Rule 60B motion, the remaining penalty phase in effecting this claim, and if time allows, counsel of choice. Of course, I'm happy to answer any questions the panel may have. Mr. Akbar was sentenced to death after his own lawyer, his own psychologist, and the prosecutor each told his all-white jury that he was 30 times more likely to be a psychopath and dangerous because he was Black. More specifically, because he was Black, he was 30 times more likely to violate the rights of others, to run a high risk of injury to them, to be contemptuous of other suffering, and to display a reckless disregard for their safety. His court-appointed advocates told the jury that his dangerousness was chronic and untreatable, that it would get more severe with time, and the best thing to do would be to lock him up and throw away the key. They made this argument even though Mr. Akbar was only 21 years old, and even though the jury could find him eligible for parole after 25 years or after 30 years. The prosecutor stood up in need to talk about his own evidence. The adversarial process truly had broken down because the defense had done his work for him. He merely invoked Dr. Eisenberg over and over again. Audre Jones is the sociopath Dr. Eisenberg says he is. You heard the doctor. Some people are just born bad. We have known since Furman and Gregg and Zant v. Stevens that the Constitution does not permit race to have any bearing on a defendant's death worthiness. What Buck cements is that this type of violation is precisely the type of extraordinary injustice that 60B was designed to correct. In other words, the hardest part of this court's analysis is done for it. But the district court here did not even entertain the risk of injustice, Mr. Akbar. It did not even discuss the merits. Instead, it again wrongly decided that the claim was hopelessly defaulted. Is there a problem? Is there a problem of the jurisdiction of the appeals court on a 60B decision here that the appeal is untimely? No, this court made the right decision in its ruling granting the COA on this case. As the court's order noted, there was an existing COA already issued. Jurisdiction was always with this court and remain with this court. The notice of appeal only serves to transfer jurisdiction, which was not necessary in this case. I know the warden took this position, but it cites a single unpublished opinion councilman that wasn't in a 60B Hirsch posture. And we know from Post v. Bradshaw that this court can review what I would dub the granting of a Hirsch 60B in the normal course. The warden's rule would have the effect of when the petitioner loses, they have to appeal. But when the warden doesn't, the appeal goes on in normal course. The judgment at all times remain the same. As noted in our supplemental brief, Mr. Akbar has many arguments to support his showing of cause. But the cleanest for this court is to assess the ineffective assistance of appellate counsel, a claim that was preserved in a timely 26B motion, and to reach prejudice by reaching the merits of the underlying violation. The district court correctly found in its Hirsch 60B opinion that the racist evidence that Dr. Back to the ineffectiveness claim presented to the habeas court in ground 24 of the initial habeas. That claim was also presented in an application to reopen before the Ohio Supreme Court. The district court, like the district court initially, when it denied the first habeas opinion, excuse me, the first habeas petition, failed to recognize how 26B and the application of rape studicata work in tandem in Ohio's system. Its opinion on its face acknowledged that Mr. Akbar had filed a 26B, raised four propositions of law, and also cited to Maupin confirming that the ineffective assistance of counsel on appeal can serve as cause, but it never engaged in the complicated analysis that Maupin requires. In Coleman v. Thompson, the Supreme Court said that the federal court has to ascertain for itself whether the rule was indeed not complied with in addition to the adequacy. In this case, the district court's analysis really just lifted the post-conviction analysis and substituted it out for what a federal court should be doing, and that's, you know, reaching a federal constitutional claim, not just whether it was presented to one of the state courts. This court found so in McGuire. It said, you know, this court, this claim was actually raised on direct appeal, albeit in a claim of ineffective assistance of counsel. So where that claim was adequately presented, and we know that from Joseph B. Coyle, it's analytically distinct, there's no EDPA issue. This court is empowered to reach the merits of this claim and set aside the default pursuant to Murray v. Carrier and Coleman v. Thompson. I can address prejudice if the court would prefer, or I can move on to the next ineffectiveness claim. Why don't you address prejudice, if only briefly, please? Certainly, your honor. Slapping a label onto future dangerousness does not dilute the poisonous effect it has in a capital sentencing. The essential feature of antisocial personality disorder is this pervasive pattern of disregarding the rights of others and causing injury to them. The court in Buck was unequivocal. It had nothing to do with an aggravating circumstance. They said no competent attorney would ever introduce evidence that his client is more dangerous than he is. The court in Buck, which was tried by Dr. Eisenberg and trumpeted by trial counsel, reached the inescapable conclusion that they were fronting that Mr. Ackbar was chronically dangerous. And they did this even though there was two parole options on the table. We know from United States Supreme Court precedent in Simmons and Skipper, down the line, even if you look at Darden v. Wainwright, it upheld a counsel strategy that was designed to avoid opening the door to the state calling his client a sociopathic personality. Here, the state didn't need to do that because trial counsel's own expert called him a sociopath. At the time of the sentencing hearing, was there an available sentence of life without parole, or was it just the life with 20 years parole and 30 years parole? There were four options, your honor. It's 25 to life imprisonment, 30 to life without life imprisonment, life without parole, and then death. So the prejudice here is also immense compared to the prejudice in Buck v. Davis. There it was an errant comment by a psychologist who ultimately opined that the client was not a future danger, an important distinction in the case at bar. But also, it was couched in almost an apology of the overrepresentation of black and brown people in our prison system. Unfortunately, Dr. Kehano said, I'm obliged to reach this factor weighing in favor of dangerousness because of the way our system is. Here, there was no apology. They embraced that urban African Americans, and I don't need to panel that Ashtabula is not urban, have this disorder at astounding rates. One percent of the rest of America has it, but urban black males have it at up to 30 percent. In closing, trial counsel looked at these 12 white jurors and he said, is that even surprising? Think about the power of that statement. The prejudice in Buck was, you know, some toxins are deadly in small doses. Here, it was, it dominated Eisenberg's testimony. The prosecutor introduced it, which is a fact that is, you know, glaringly absent from the warden's supplemental brief. But counsel embraced that statistic and kept bringing it up over and over again because he was in this perverse corner of his own making where he wanted his client to be more dangerous. It really highlights the problems with ASPD, but I want to underscore that this court does not need to reach any kind of categorical bar on whether that could ever be mitigating, even if double edged. It's enough here that it was unconstitutionally tied to Mr. Akbar's race. I can address the Martinez arguments, but I also want to reiterate that it's not necessary to extend the Martinez rule 226B in this case because cause can be established under Coleman. The other mitigation claim existing in the briefing is an extension of this injustice, but it's different because it doesn't require, you know, the racist evidence to reach the Ohio Supreme Court's application of Wiggins was unreasonable. ASPD has been called by other circuits, you know, a basket of cobras on its best day. And we saw that play out in this penalty phase. It was abysmal, the prejudicial effect that this evidence had. But stepping back and assessing counsel's performance under Wiggins, it's clear that antisocial personality disorder wasn't just prejudicial and harmful as a strategy, if it could be such, it was actually inaccurate. Mr. Akbar was taken from the hospital as a baby to his mother's foster home. He's been a ward of the state of Ohio for all but three years of his life. And counsel didn't think to look at his only parents' medical records or mental health records, even though that mother had killed herself when Mr. Akbar was 13. In post-conviction, counsel's affidavit was Exhibit A for Ohio's brief. Exhibit B was an affidavit from Dr. Eisenberg. So, if you want to talk about the optics of disloyalty, you know, that's relevant here. And in that affidavit, trial counsel said, you know, my mitigation specialist tried to get the records, but couldn't, but I just decided that we didn't need them. But then, once penalty phase unfolded, the state of Ohio walked across to the defense table and handed him a binder full of the mom's medical records. And so, he throws it into the jury room in raw form. You know, medical jargon, doctor's notes, you know, a large part of my job is to look these notes. I could tell you it is difficult, let alone in a capital jury deliberation setting. And expected the jury to do his job and to mine those records for usable mitigation. The diagnoses in those records, not to mention the horrific tales of trauma that she endured, you know, she had multiple serious substance abuse addictions. The word addiction didn't even appear in front of the jury. He called the foster grandmother instead, who, you know, she smoked reefer. This woman had been institutionalized six weeks before her suicide. Mr. Akbar visited her. She was suffering from manic depressive disorder, hallucinations. You don't have to be a doctor to understand these things. Judge Moore, you pointed this out in Foughtenberry, that you can't just hand the keys of your mitigation presentation to the expert and walk away. I'm not a psychologist, but I read this penalty phase and immediately I knew that there was some scientific problems with these ASPD diagnoses. Dr. Eisenberg made them simply by looking and seeing that the woman had dockets. And that's highly problematic. He told the jury that Mr. Akbar was antisocial because of the first degree biological risk from his equally antisocial mother. Let's set aside, you know, the racial implications of that statement. He didn't even look at anything that happened to her before she became an adult. ASPD on its face, you know, opened the DSM. Differential diagnoses of Axis 1 disorders, and to make that lay terms, you know, PTSD, bipolar, manic depressive, schizophrenic episodes, substance abuse even, which is Axis 2, preclude that diagnosis. So his diagnosis was faulty. Counsel didn't make a strategic decision not to get those records. He actually admitted that his team tried, but he didn't follow up with a subpoena. And then his conduct in throwing them into the jury room, that's not a subtle tactical choice as according to the state court. That was a triage because he realized, I missed a lot of stuff in here. But if you take a step back and look at the evidence that was in those files, it's clear under Wiggins and Williams v. Taylor that he did not have the information at his disposal to make an informed strategy about what mitigation should be. He listened to this doctor. So the doctor hinges this antisocial diagnosis for Mr. Akbar on his mother, who he's never examined. He never looked at her medical records until the night before he testified, and where his report and his recommendations and his diagnoses were set in stone. The prosecutor even brought that out on cross. He said, well, when you came over to my office last week, and I interviewed you, you didn't say anything about looking at any other documents. And he said, well, it doesn't change my opinion. And it should have on the face of the DSM itself. He committed the same air of science with Mr. Akbar. He told the jury that Mr. Akbar had been diagnosed before 15. And it's clear from Mr. Akbar's record that the necessary evidence to make such a diagnosis is not present. He told the jury he was convicted of theft and criminal trespass. I just want to give the court a little insight into what that theft was. 18 months after his mother killed herself, and his foster mother was working the 3 to 11 shift, you know, this jury never even heard who fed this kid dinner growing up. He was accused of pocketing a sports mouth guard at a Hills department store. It cost $1.28. This was in August before he entered high school when football starts. That's the theft that Dr. Eisenberg said supported a diagnosis of conduct disorder. That was the only time he got in trouble with the law before he turned 15, which is pretty the trauma that he went through. The criminal trespass was not even valid to support this diagnosis because it occurred after his 15th birthday. And that was when he and a classmate went to visit a white classmate of theirs in their class. And the girl's mother was upset and called the cops. Those are the two incidences that led Dr. Eisenberg to tell this jury that this 21-year-old boy was hopelessly incorrigible. That he lacked empathy, that his personality was disordered. Instead of couching it in terms of trauma and what he deserved in that penalty phase. In post-conviction, yes, Your Honor? I know your time is very limited and I don't want to interrupt that, but I do hope that you will get to the fair cross-section issue and whether that is in fact preserved so that we can address that. Certainly. You can finish what you're doing. I just see that you've only got seven and a half minutes left. No problem. It's a lot to get in. I just wanted to point out in relation to this ineffectiveness claim that doesn't suffer from a default like the 60B, even though I don't think that's an obstacle to relief. That in post-conviction, other witnesses were amassed. Mr. Ackbar's father, his paternal grandmother, his peers, his cousin, another foster child who lived with him. This was explained away as subtle tactical choices to put forth law-abiding citizens. As courts often do with circling claims, they invent a reasonable strategy and that's the end of it. But here, if you look at the affidavit that counsel put forth in support of the state's brief, you could tell from the face of that that he doesn't understand his obligations under Wiggins. He said, well, I don't remember any of these names being given to me, so I didn't interview them. Or, you know, I wrote this guy a letter and the dad responded and we never heard from him again. It fundamentally misapprehends counsel's obligation to be the advocate and the gatekeeper and the instigator of this development. I'll turn to the fair cross-section claim, Judge Moore. You know, the treatment of race judicata in the denial of the 60B is flummoxing because of the way the court really engaged in some judicial gymnastics to get away from the Martinez obligation to reach the merits of the claim as presented. This gets a little complicated, as everything in this case can be, but on direct appeal, this claim was raised and this is all couched in a change of motion venue that counsel was ineffective, that the court erred, and then also that counsel was ineffective for showing that the change of motion was necessary to protect Mr. Ackbar's right to be tried by a fair cross-section of his community. So there was a claim brought on direct appeal and then a claim brought in post-conviction with very little evidence attached. It was some printouts from the Census Bureau. It's, you know, far from what is required under the three-prong test of Dern v. Mississippi to establish the violation. After the Martinez remand, you know, significant statistical analysis with the help of a statistics expert was put forward to the district court. And in deciding the claim, if I can use the word deciding, the district court judge said, well, you know, had this claim been adjudicated, the finding of default, the finding of race judicata under the state rule would have been set aside because of these seven pages of printout. You know, that's enough evidence to I'm setting aside the default under the state court rules and therefore the claim is no longer defaulted and therefore do not have to reach the merit of the violation under Martinez. We have pled and, you know, our briefing is clear that this was, you know, clearly not the spirit of the remand because the equity of the Martinez remand was to reach the violations of substantial claims that had found to be defaulted. The district court did not acknowledge that the setting aside of the state procedural rule on separate cause grounds would, in the normal course, lead to a merits analysis. It just did not decide the merits in either event. We have presented to this court that that constitutes error because the substantial nature of the violation was never ruled upon, whether the cause was set aside for purposes of race judicata or for purposes of Martinez. I'm not sure if you finished that argument or not, but I did have a question about the argument that the post-conviction counsel was ineffective in failing to raise the claim that Mr. Akbar was denied a right to a public trial because of denied entrance to the courtroom by deputy sheriffs. And I don't know if there's a Martinez-Trevino problem there, so I know your time's expiring, but maybe you could address that. You know, the Supreme Court law on closures has recently changed because of Weaver versus Massachusetts, and that has held that structural errors brought in post-conviction, you know, the petitioner must show prejudice, and this is to guard against a sandbagging of sorts by the courts. You know, you see a closure, you're going to save it for appeal, you know, something I've never seen happen. But in any event, we recognize that change in the law, but the spirit of Martinez, the chief concern of Martinez and Trevino to bring, you know, a merits ruling to unheard claims of that. But where trial counsel had no knowledge of this closure, the post-conviction counsel did and failed to raise it, that this is a substantial claim of ineffectiveness, particularly if trial counsel should have known of the closure and failed to raise it. And prejudice under Martinez needs to be established anyway, so we do not think that there's any tension between Weaver and that extension. But, you know, there is no law that we can find where this situation is replicated. But then again, there is, you know, no, I don't think real danger of this occurring. This seems to be a very rare, unique violation. But considering the composition of the veneer, you know, the all-white jury that was chosen, the racial dynamics at play here, this also, you know, runs into the counsel of choice issue. And I do think that merits review on the racist evidence claim is appropriate now because it strengthens the legitimacy of Mr. Ackbar's position when he asked the trial court for counsel because he didn't trust trial counsel. He asked for that, you know, in the heat of jury selection, I recognize that. But his Sixth Amendment right to counsel that, you know, where a conflict was not brewing, where he wasn't interfacing with Dr. Eisenberg, and we know from his affidavit and post-conviction that a lot of the conflict stemmed from his utter breakdown in communication with Dr. Eisenberg, who was the only expert he had met at that time. We know from trial counsel's affidavit in support of the 60B that, you know, Ackbar made this request right after trial counsel told him, life without parole is what I'm praying for, and it's your only hope. That really angered him. And he, you know, the trial court erred by calling that, you know, not a complete breakdown in communication. That is an unreasonable application of Powell. We take the position that Powell controls this case. The Ohio Supreme Court applied wheat, but even under, you know, an application of wheat, I realize I'm out of time. You can finish your sentence or two there. Even under an application of wheat, it just reinforces the presumption of counsel of choice, particularly where one of these lawyers has a conflict or a potential for conflict. Mr. Ackbar told the trial court, listen, I don't trust this guy. My objective for this trial is different than his. My family has scrimped a thousand dollars. I have someone ready to go. He just needs a few months. And this trial went, you know, went to trial lightning fast, five months after he met his lawyer. So if anything, wheat weighs in favor of the presumption of choice because the conflicted counsel, which wheat recognizes as a separate Sixth Amendment violation, was also implicated. Thank you. Thank you, Ms. Bailey. We certainly appreciate your arguments. And you'll have your five minutes of rebuttal. Mr. Willie, we'd love to hear from you next. Thank you, Your Honor. May it please the court, Charles L. Willie, Assistant Attorney General, arguing on behalf of the warden. Your Honors, one may say that in this case, there really are three basic issues. The first being with respect to the claims that were adjudicated by the state courts and which were certified for appeal. The issue is whether the state courts adjudication of those claims was objectively reasonable under the standards set forth by the Anti-Terrorism and Effective Death Penalty Act. The second issue is with respect to claims and arguments that were advanced after the district court rendered a final judgment in this case. That those arguments and claims present the question of whether, first, the district court had jurisdiction or authority to review those claims. And secondly, whether this court has the jurisdiction or authority to review the claims. And thirdly, Your Honor, with respect to claims that the district court considered, particularly with respect to the Rule 60B motion, to the extent that the district court concluded that those claims were properly adjudicated under 60B because they did not constitute a claim or a ground, but rather constituted an effort to reverse a previous procedural ruling, then the question becomes, did the district court abuse its discretion in concluding that those claims were not a sufficient basis for relief from judgment? Now, what is important here, Your Honors, I would submit, is there is an important distinction between reviewing the merits of a claim that's presented properly in a habeas corpus petition versus reviewing a claim that is presented via a Rule 60B motion. Because in that sense, then, the only issue that's presented to the court is whether the claim satisfies a reason for relief from the court's judgment. Here, the district court, with respect to the claim concerning counsel's presentation of expert testimony, the district court found that that claim was not subject to the second petition rules because it was a proper, the district court found that it was a proper attempt to overturn the previous holding of the testimony was defaulted. So here, Your Honor, it comes down to this. The district court said it was not because the petitioner had not shown any extraordinary circumstances as to why the court should revisit the previous procedural default holding. Now, appellate has somewhat, I think, mixed up and mixed together some of the claims in this case. But ultimately, whether counsel was ineffective in his hand of the expert testimony, Your Honor, quite frankly, the case primarily relied upon by appellate, the case involving racialized evidence, is not helpful because it doesn't constitute an extraordinary circumstance, because the extraordinary circumstances that existed in that case, which the Supreme Court found indeed justified setting aside a default, are not present here. In this case, in the Texas case, three things are very important. First, the state actually, in one case, conceded that the testimony at issue was erroneous. And the state, indeed, in five other cases, indicated that it would not oppose the prisoner's claims. Well, also, in Texas, future dangerousness is actually an aggravating circumstance, which warrants a capital crime. Here, of course, future dangerous is not an aggravating circumstance in Ohio. I think that very much differentiates the case. But again, I want to emphasize that what we're talking about here is not the underlying merits of the claim. What we're talking about is whether there's some reason to set aside the previous procedural default determination. I understand your point, but I do think that when you look at the merits, it looks like a very bad case for your side. May I address that, Your Honor? Yes, thank you. Thank you. Because actually, it does not have the earmarks of racialized testimony that was present in the Texas case. First, Your Honor, as I said, in Ohio, future dangerous is not an aggravating circumstance. Secondly, Your Honor, the prosecutor in this case did not argue, nor the defense attorney, did not argue somehow that race should be a factor in the court's determination. On the contrary, what the gist of the mitigation was, the doctor's testimony essentially was this. Personality disorder is a recognized mental disorder. In this case, it was appropriately mitigating because people with this type of disorder, it is environmental in nature, in the doctor's opinion. It's caused by a deprived environment. It also, in essence, reduces culpability because I believe the doctor testified that Mr. Jones, he was actually acting with the mentality of a very juvenile person. That's part of the analysis. That's part of the diagnosis. Most importantly, Your Honor, what Dr. Eisenhower, what was brought out in cross-examination was simply this. Yes, there are studies which seek to learn how our diagnosis of personality disorders and other mental illnesses correlate with the overall population in terms of race, sex, national which is attempted to know how a diagnosis occurs over various people. There's never been any suggestion that somehow race is a causative factor or race renders a person more likely to be to commit violence. Your Honor, the prosecutor in this case was attempting to attack the diagnosis. His point was that it was ineffective assistance of the defense counsel. Let Dr. Eisenberg be able to testify in cross-examination and be on the part of the lawyer to emphasize this during his arguments at the sentencing phase. That's correct, Your Honor. It is an ineffectiveness claim. I would differ that the counsel emphasized this. What the counsel, the theme of the mitigation was that due to this personality disorder, a recognized illness, that Mr. Jones was less responsible. He was less culpable. As a matter of fact, Dr. Eisen testified that just because of these statistics doesn't mean that Mr. Jones was more prone to commit murder or violent behavior. He made the opposite point. He made the opposite point that that's simply not the case. Rather, the gist of his mitigation was that because personality disorders like this are caused by a deprived background, essentially, that's why it's mitigating. That's why it should be considered. My point is that's why the prosecutor attacked the diagnosis because he could see, just as the jury, I'm sure, could see that this was presented as a mitigating factor. This was presented as something which the jury should take into account and in a way would militate against a capital sentence. Now, with respect to the jurisdictional question here, again, I want to emphasize that at issue here is whether the district court abused its discretion in denying relief from judgment. Well, the appeal, the denial of a Rule 60B motion, Brick Maddowl, a matter for appeal, it must be appealed because the 60B does not bring into question blind judgment. What it brings into the question is whether the court in denying the was correct in finding that there was no basis to vacate the previously issued judgment. In essence, what you have here is you have appellant who is asking this court to hold that the district court abused its discretion in not granting the relief from judgment based on these arguments when, in fact, the appellant did not appeal that decision. The appellant did not appeal that judgment denying Rule 60B. In terms of... As I understand your opponent's response to my question on that, she's arguing that there was retained jurisdiction in the court of appeals on the basic case and so there was not a need to file notice of appeal within 30 days for the 60B ruling. Your Honor, we must look very carefully at the remand in this case. The remand in this case was for the purposes of allowing Jones to present additional arguments under the Trevino case with respect to claims in the petition which were held to be procedurally defaulted. That was not a mandate or that was not a mandate to present new claims and for good reason. It is very... It is clear. We know that under this court's current precedent, a person, a petitioner cannot evade the second petition rules by presenting new claims for the first time on appeal and then seeking to return to the district court to amend the pleadings to present those claims. Here, the ineffective assistance of counsel claim for the failure to handle correctly the expert testimony, that was a claim which was found to be procedurally defaulted. Therefore, the district court said that insofar as he's only attempting to overturn that default holding, then he can do it under 60B. But in no way did the district court suggest that now he... That appellant was free to amend his pleadings to assert other claims or to... Aside from ineffective assistance of counsel or any claim. And for good reason. As a matter of fact, I think the district court found correctly that in seeking a remand with this court, the appellant argued explicitly that it would be up to the district court in the first instance to consider these arguments. In other words, it was up to the district court in the first instance to determine whether a claim was properly before it. And in the Trevino case would apply. Now, interestingly enough, many claims have been presented subsequent to the district court's judgment that are not ineffective assistance of trial counsel claims. And I want to emphasize that too. It is well established that Trevino exception created or recognized or expanded in that case only to one type of claim. A claim of ineffective assistance of trial counsel that could not effectively be presented until post-conviction. Now, let's take a look at the claim that counsel was ineffective for not handling the expert testimony properly. It's a matter of record, Your Honor. That's a matter of record claim. That claim can be presented on direct appeal. It's not a claim that needs to have any development outside the record. As a matter of fact, one could say that if an attorney attempted in Ohio, attempted to raise that claim in post-conviction, ultimately the very high chance that it would be held to be res judicata unless the attorney came up with compelling evidence towards the record. Now here, the decision of the Supreme Court of the United States, under the circumstances presented in that case, there was very great reason for the court to decide there was extraordinary circumstances. But the decision of the Supreme Court is not an extraordinary circumstance. It's evidence outside the record. Now, this claim really was presented in state court. Well, that really defeats the appellant too, because the only way that this claim could be brought within a 60B is that if it had not been properly adjudicated due to a procedural error by the district court. In other words, it can only be brought in 60B if you can show that the district court erred in its procedural default determination. And as this court has also pointed out, it's a very rare circumstance in which a intervening court decision will constitute the kind of extraordinary circumstances that are required to justify relief under Rule 60B. With respect to the other claims of ineffective assistance, there are two claims that were properly presented to the state courts. The first claim was at the Ohio Supreme Court that the trial counsel was ineffective not for failing to produce mitigating evidence, but rather counsel was ineffective because he mishandled the evidence that he had. He didn't make the right arguments. In other words, the argument was counsel should have used these, he should have pointed out more mitigating things in the evidence that he presented to the court and to the jury. Rightly so, that claim can be presented on direct appeal. And reasonably, the Ohio Supreme Court said, look, this is a matter of pure strategy. I mean, there was no indication here that the argument here was not... ... evidence outside the record, if a claim is that the trial counsel didn't present all the evidence possible. It could, the precise claim that was raised on direct appeal was totally dependent on the evidence. I mean, the counsel, the claim there was not that counsel dropped the ball and could have gotten more evidence. The claim on direct appeal, rightly so, was the evidence that counsel did present, he did not effectively utilize. Now, under Ohio, and the Ohio Supreme Court reasonably found that counsel's about how to emphasize the... ... evidence to emphasize and not... And, you know, here, of course, there's no indication, the counsel didn't argue on direct appeal as there was a deficient investigation. Counsel basically said, look, he got this evidence, he just didn't know how to use it. He should have used it better. And that is a pure matter of strategy, which Ohio Supreme Court reasonably said, well, did not sustain relief. Now, in terms of the post conviction, the post counsel argued that there was indeed additional evidence that could have been discovered and presented. The state courts held essentially that that additional evidence was cumulative of evidence that was already presented. This court has held that where an issue is raised as to whether counsel should have presented more evidence and mitigation, it must be shown first that the is different in kind and nature and strength than the evidence that was actually presented. Here, the state courts reasonably found that that was not the case. This evidence was consistent with evidence already presented in mitigation. And secondly, with respect to prejudice, it's noteworthy, your honors, that on direct appeal, a reasonable appellate attorney felt that the evidence presented in mitigation was so compelling that it warranted actually raising as a proposition of law that the sentence, the aggravating circumstances did not outweigh the mitigating evidence or factors that were presented. In terms of a few other issues raised by appellant, in terms of the whole idea of established, that that doesn't raise any underlying claim. I mean, what it does is that the only claim that's raised by a request to reopen, an application to reopen a direct appeal on the basis of appellate ineffectiveness is appellate ineffectiveness. It doesn't present any of the merits of any underlying claims that is asserted should have been raised by appellant. And again, also, what's key here is that this claim has to be defaulted. If it's not defaulted, then there's no basis for raising it in a Rule 60B after final judgment is issued. Because again, as the Supreme Court has made clear, a Rule 60B becomes a second petition when it asserts grounds that attack the underlying judgment. And that's essentially what you're doing when you raise a claim that, well, actually, the claim really was not defaulted, but I have better arguments or I which allows a revisitation of that claim. Under the second petition rules, that cannot be the case. It just cannot be the case. You cannot do that in the guise of a Rule 60B. Now, initially, I know your time is running out, and I just want to be sure that you have adequate time to address the section. Yes, and Your Honor, what's the issue here is not the underlying claim, but rather whether counsel was ineffective in how the counsel handled that. Here, the post-conviction counsel actually raised this issue. And in any event, the district court reasoned that, well, wait a second, this claim is not really defaulted because this claim, he presented enough evidence outside the record. But what's the most important thing here is, all that is, was this claim of ineffective assistance of counsel for not adequately supporting the fair cross-section motion, was that presented in the first, in the petition originally? If it was not presented in the first petition originally, then it doesn't make any difference because it cannot be presented for the first time in a Rule 60B motion. Because the only, again, the only thing at issue in Rule 60B is, oh, did the district court initially, in the first, in his judgment, find the claim to be defaulted? And was that, could that be overturned under 60B? It's not the merits of the claim that get to be revisited. Now, in terms of also just how much post-conviction counsel did present evidence, how much more, is it likely that a second attempt to do that would have resulted in anything different? I mean, again, this is an issue that's really in the nature of, this is in the nature of an on-the-record claim. In Ohio, it's very difficult to overcome res judicata for those types of claims with evidence towards the record. And it's extremely unlikely, it doesn't seem to be likely that no matter how evidence that somebody might have come up with, not only, but also not only do you have to do that, you have to show that counsel, trial counsel, was unreasonable and didn't do a sufficient investigation to support this motion and could have discovered this additional evidence within the time constraints of litigating the case. And so there again, there are many, many hurdles here involved. As far as the public trial issue, here again, there's absolutely no evidence presented that the courtroom was ever shut down, that anybody was ever, the court excluded anybody from attending. And, but there's no evidence also that counsel had a reason to think, trial counsel had information or reason to think that that might be an issue. Again, we're talking about the ineffectiveness. That's the basic question. And to do that, one must say, well, is there any evidence here that you can say a counsel was substantial, substantially should have anticipated this and made such an argument? The district court did not think so. And we would submit that that finding is fully supported by the record. Does the court have any questions in terms of, I know we've covered quite a bit here. I would like to circle back for a second. I want to get through your arguments, but I wanted to circle back to ineffective assistance issue with respect to Dr. Eisenberg's testimony. And if we are able to get to the merits of the issue, there's not a problem of jurisdiction. There's not a, you know, another 60B issue and we were to get to the merits. I'm not sure I fully understand your argument that this somehow evades the buck standard. Seem, at least there's a good argument that when your own lawyer presents expert testimony that went to the so-called psychopathy of urban African-American males and likelihood of committing crimes at 30 times the rate of the general population, and then prejudicial, deficient performance and prejudice. It seems like that's just fundamentally harmful to a defendant's case. It's not, your honor. I would respectively submit. Here's why. Once again, the question here, the racial statistics came up with respect to what's the incidence of this diagnosis among various groups. That's how it came up. And there's nothing for the jury to indicate that, oh, yes, what they're arguing here is Mr. Jones, due to his race. Yes, we concede that he's dangerous because of his race. What they were arguing is that due to his deprived background, he had a personality disorder that was recognized as a legitimate psychiatric condition. And that's why the jury should consider punishment less than death. They disclaimed. I'm sorry to interrupt, but what is the deprived background? Is the deprived background situation with his mother and family and. It all fit together like. Or is it being an urban African-American male? What what see what what you have here, your honor, is you have you have the counsel saying that puts his expert on the stance is what causes this, your honor? What caught or what causes this doctor? What causes this type of personality disorder? And the doctor says, well, the first cause is when you have an environment, when you have an environment that deprives people of the kind of emotional support that this this man has not had, when you have an environment where you have no father figure, where you have nobody involved in your life, where you have people who are continually basically not not caring at all about you. This contributes. Now, the prosecutor gets up and says, wait a second, just because, you know, he's had a deprived background doesn't mean he really had this personality disorder. I mean, a lot of people get this right. Isn't it a fact that three percent of the population have been diagnosed with this? Yes. Isn't it a fact that, you know, certain number of African-American urban males are diagnosed with this? Yes. But the doctor went on to say what I'm saying here is this man had this has this personality disorder is significantly mitigating because it explains why he would do this type of crime. I mean, in essence, it is a controversial subject. I will say yes, because many people under real recognize that personality disorder is basically defined as people's criminal behavior. I mean, that's that in a lay person's terms. Right. So that's why it's controversial. But in this case, the defense presented it in a way that it was mitigating and it fit the other mitigating evidence that was presented. I submit, your honors, that there was absolutely no hint whatsoever to the jury here that they should consider Mr. Jones race in determining whether he should be sentenced to death. On the contrary, they were asked to consider whether he had a personality disorder, which weighed against sentencing him to death. And that was the gist of the argument. In terms of overall, your honors, again, I would just ask that the court carefully consider that it is a complex procedural history. And believe me, getting ready for the argument, I was thinking, well, I hope I don't blow this because it's kind of confusing. But I would ask the court to carefully consider the jurisdictional issues and affirm the judgment of the district court. Thank you, Mr. Willie. You have five minutes rebuttal. Thank you, your honor. Some people are born bad is not about environment. The face of the DSM describes antisocial personality disorder in one to 3% of the population. It doesn't make any accusation that that's because of environments. This is a racial appeal. It could not be more clear. 25% to 30% of urban black boys lack empathy when only 1% of the What counsel is describing is the justification for pursuing ASPD in Ohio that has been circulating for decades. He's not addressing the racial aspect. There's no study that was cited. This is a false and racist equivocation of being in prison with being born bad. That's the heart of the claim that the warden doesn't seem to grasp. And the court in Buck didn't say no competent counsel would argue that his client is a future danger on account of his race when it's necessary for an aggravating circumstance. The period was on account of his race, period. I've mentioned Skipper. I've mentioned Sibbins. I've mentioned Darden B. Wainwright out of Florida. This is dangerousness is never strategic when it's based on race. And contrary to what the warden says, the trial court itself in its 29, 29.3 opinion found this evidence to be aggravating. It said the psychological evidence as presented by Dr. Eisenberg actually cut against mitigating factors of his troubled upbringing and his youth. So the trial court who we trust to set aside, you know, pandering to found that this hurt. There's no studies. The statistic is false. On redirect, you know, the warden suggests that because on cross-examination, Dr. Eisenberg said, you know, they don't all go on to commit murder, that somehow dangerousness is mitigated. But he forgets what happened on redirect. Trial counsel got up and trying to rehabilitate his theory said, well, yeah, isn't the reason a lot of these guys aren't committing murder, but for their incarceration, murder and dangerousness. There's many ways to be dangerous that don't involve murder. The court in Buck didn't say, well, you're not going to kill again. So you can't be dangerous again. There's plenty of things in prison that Skipper and Simmons recognize are reasons that attack this diagnosis. He fully embraced it. You just have to read his closing. Oh, Dre Jones is the sociopath. Dr. Eisenberg says he is. He invokes Dr. Eisenberg over and over again. He doesn't even mention his own expert. The 60B got a little muddled there. This is what is what is clear. The district court found that this claim properly relates back to a claim in the petition that was found to be procedurally defaulted. In our supplemental brief, I presented ways to establish cause for the default. It's clear and the warden is wrong on the law that where an ineffective appellate assistance of counsel claim is fairly presented. Joseph B. Coyle, that is cause for the default of the underlying claim. This court is empowered to reach the merits through a straightforward application of Coleman v. Thompson. The default of this claim has always been challenged. This court might not be surprised to learn that Mr. Akbar actually moved for a COA on this claim himself, citing the interplay between 26B and Ray Stuttakata. That's in 2008. He said the district court didn't appreciate the procedural default analysis and where the district court engaged in the same short circuited analysis this time, misapplied the law, the court abused its discretion. I just want to read underscore that this is what 60B is for. Just last month, this court granted a 60B petition on a case that was final on habeas 25 years ago because of a racial violation. This systemic breakdown in this case is palpable. He had two ineffective attorneys in a row. The district court misapplied the procedural default analysis. He's never received merits review on a clearly meritorious claim. It undermines public confidence in our system, and it clearly prejudiced Mr. Akbar. Race is something we've been fighting since the beginning of 8th Amendment jurisprudence, and this court needs to dig into its deep reserve of equity and correct the injustice. Thank you. Okay. Ms. Bailey, I'm sure it's in your briefing. You just made reference to a case our court decided under 60B-6 recently. Do you have a citation to that case? I do, Your Honor. I believe it was Mitchell v. Genovese. I don't have the full citation. We can find it. Okay. Well, thank you, counsel, for your arguments. From my perspective, this is a complicated case procedurally with lots of moving parts, but we'll take the case under submission and have a decision for you in due course, but we thank you for participating in arguments remotely like this and hope that you have a safe coming weeks and months, given all the circumstances we're dealing with. So, thank you very much. The case will be submitted. Mr. Gifford, you may adjourn court. Thank you, Your Honor. Thank you. This honorable court is now adjourned.